IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

AMANDA HUGHES,

                    Plaintiff,                    OPINION AND ORDER

          v.                                      18-cv-0378-slc

ANDREW SAUL,
Commissioner of Social Security,

                    Defendant.

          Plaintiff Amanda Hughes filed this action seeking reversal of the final decision of the

Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB)

and Supplemental Security Income under Titles II and XVI of the Social Security Act (Act).  42

U.S.C. §§ 405(g), 423 et seq.[1]  The parties have consented to the jurisdiction of the United States

Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  This is a case that the ALJ arguably could

have decided in either direction; but, finding no error in the ALJ's analysis or conclusion, I am

affirming the decision of the Commissioner.

          The following facts are drawn from the Administrative Record ("AR"):

FACTS

**I. Background**

          Hughes was born on November 8, 1984.  She has a high school education and associate

degrees in music technology and video and motion graphics.  In 2004, when she was 19, she was

diagnosed with inflammatory arthritis.  She also has been diagnosed with degenerative joint

---

          [1]  This court has amended the caption to reflect that Andrew Saul was recently confirmed as the
Commissioner of Social Security.

disease in her lumbar spine and knees, sacroiliitis, suspected fibromyalgia, depression, and anxiety. In addition, she is morbidly obese, with a body mass index of 50.

After graduating high school, Hughes worked as a claims adjuster, a cashier, and a telephone captionist. She quit her job as a telephone captionist in 2011 because of her health issues and has not worked since.

Hughes has been followed for her inflammatory arthritis and fibromyalgia by Katherine Phillips-Riemer, a rheumatology nurse practitioner, since at least 2011. Phillips-Riemer, who sees Hughes every three to six months, has prescribed medications (including Humira, Cimzia, prednisone, Lyrica, gabapentin, and others) and administered local steroid injections, but Hughes has continued to report pain, especially in her knees, hips, and lower back. Hughes's primary care physician since January 2013 is Dr. Jennifer Somers, who sees Hughes every three to six months, prescribes narcotic pain medication, refers her to specialists and manages her care. That care has included evaluations and treatment from pain clinics, rehabilitation medicine specialists, and orthopedic surgeons.

In November 2014, an orthopedic surgeon advised Hughes against knee surgery unless she lost weight, recommending that she consider bariatric surgery for weight loss. AR 517-18. However, Hughes never followed up with the bariatric surgeon. Other treatment recommendations included a nerve block for her knee pain, warm water exercise, a progressive walking program, and dietary changes, but Hughes did not pursue those options, either.

In September 2016, Hughes experienced an onset of acute back pain with left leg tingling and weakness; an MRI showed that Hughes had a large herniated disc at L4-L5. In October 2016, Hughes had back surgery to repair the disc. Although Hughes initially did well after the surgery, her left leg pain returned and she had a persistent foot drop on the left. An updated

MRI in December 2016 showed possible recurrence of disk herniation at L4/L5. Hughes was referred to physical therapy. AR 767.

In addition to her physical problems, Hughes struggles with anxiety and depression, for which she has taken a variety of medications. She received psychotherapy from Elise Comello, a licensed social worker at the Pauquette Center, on a somewhat regular basis from April 2014 to March 2015. AR 545-. She saw Comello again in April 2015 and September 2015; at the September visit, Hughes reported having gone tubing with her friends a couple times. AR 554. Hughes was eventually discharged from services at the Pauquette Center because she missed too many appointments. AR 557. According to Comello's discharge note, Hughes "struggled to make progress due to not attending sessions for long periods of time and failing appointments due to illness. [P]auquette allowed for more missed appointments than typical to accommodate her illness but she expired through them." *Id*. AR 557.

In July 2015, Hughes established care with Dr. Heather Huang, a psychiatrist, who reclassified her mood disorder as related to a bipolar disorder. Huang adjusted Hughes's medications, advised her to see Comello every 2 weeks, and to exercise, even if for 5 minutes a day. AR 594-95. Hughes saw Dr. Huang for medication management roughly every 2 months, although she did not see her at all from July 2016 to January 2017.

## II. Medical Opinions

### A. Mental Impairments

In December 9, 2014, Hughes was seen by Gordon I. Herz, Ph.D., for a consultative Mental Status Evaluation at the request of the state disability agency. Herz diagnosed Hughes

with major depressive disorder, generalized anxiety disorder, and pain disorder. Reflecting on

Hughes' capacity to work, Herz wrote:

> This claimant is quite able to understand, remember and carry out simple instructions. Interactions with supervisors and co-workers are likely to be perceived to be ineffective at times, with the claimant likely being preoccupied with personal issues and subjective emotional and physical difficulties, potentially to the neglect of work-related expectations. Concentration, attention and work pace have the potential to be normal but will be reduced at times with heightened preoccupation with personal issues. She would have slight-to-moderate difficulty withstanding routine work stresses and adapting to changes.

> AR 503.

On January 14, 2015, state agency consulting psychologist Esther Lefevre, Ph.D.,

reviewed the record in connection with Hughes's application for disability benefits. Lefevre found

that although Hughes had some moderate limitations in social interaction, responding to changes

in the work setting, setting realistic goals, and making plans independently of others, Hughes was

"able to perform the mental demands of simple, routine unskilled work." AR 120-121. In

reaching this conclusion, Lefevre indicated that she had given "great weight" to Herz's December

2014 consultative evaluation of Hughes.

On May 22, 2015, Hughes was evaluated by a second consultative examiner, Jean

Warrior, Ph.D., who drew the following conclusions:

> Ms. Hughes is able to understand, remember, and carry out simple one and two-step instructions. She is a pleasant young woman who could respond appropriately to others in the workplace. Concentration, attention, and work pace would be judged moderately reduced due to intrusion of pain and occasional anxiety. She probably has mildly reduced ability to respond to work stressors. Her primary issue has been with attending regularly and persisting through a full work week due to her pain issues.

> AR 535.

On May 28, 2015, Jan Jacobson, Ph.D., a consultant for the state disability agency, reviewed Hughes's disability application in connection with her request for reconsideration of the agency's initial denial of benefits. Assessing Hughes's mental RFC, Jacobson found that Hughes had some moderate limitations in social interaction and adaptation, but that she would be "able to sustain at least basic demands associated with relating adequately with supervisors, co workers and general public," and was "able to adapt to routine workplace change, remain aware of environmental hazards, form basic plans/goals, travel independently." AR 167-68.

In January 2017, Dr. Huang completed a questionnaire about Hughes's impairments. Dr. Huang indicated that she had been treating Hughes since July of 2015 and seeing her every 1-3 months for anxiety and bipolar disorder, the symptoms of which were daily anxiety, poor motivation, low mood, fatigue and nausea. Huang opined that Hughes had moderate restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked deficiencies of concentration, persistence or pace. Dr Huang concluded that Hughes was not a malingerer and her impairments prevented her from working. AR 563-65.

### B. Physical Impairments

On January 12, 2015, a doctor for the state disability agency, Mina Khorshidi, M.D., reviewed Hughes's application, including her medical records, and determined that in spite of her impairments, Hughes could perform light work (lifting 20 pounds occasionally and 10 pounds frequently), and sit, stand or walk for about 6 hours each in an 8-hour workday. AR 119. A second state agency consultant, Syd Foster, DO, reached largely the same conclusions when he reviewed the record on May 29, 2015. AR 150.

In early January 2017, Dr. Somers completed a questionnaire about Hughes's work abilities. Dr. Somers reported that she had been treating Hughes since January 2013 for inflammatory spondylopathy, lumbar stenosis, and a left foot drop, the symptoms of which were pain, depression and decreased mobility. Somers wrote that Hughes had moderate joint pain in her hands, ankles, and knees and moderate-to-severe back pain that had improved after her surgery. Somers estimated that, during an eight-hour work day, Hughes could stand for 15 minutes at a time for a total of less than 2 hours; sit for 30 minutes at a time for about 4 hours; required position changes at will; would need an unscheduled break every 2-3 hours for 15-20 minutes; could rarely lift 20 pounds and could occasionally lift 10 pounds; could use her hands, fingers and arms for fingering and handling for no more than 20 percent of the workday; and would be absent more than four days a month. AR 860-63. Dr. Somers indicated that Hughes was not a malingerer but that emotional factors contributed to the severity of her symptoms and functional limitations. Like Dr. Huang, Dr. Somers opined that Hughes had moderate restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked deficiencies of concentration, persistence or pace.

Phillips-Riemer, the nurse practitioner, also completed a questionnaire. Like Dr. Somers, Phillips-Riemer indicated that Hughes had a limited ability to sit and stand, would require position changes at will, was limited in her ability to use her hands and fingers for fingering and handling, and was likely to be absent more than four days a month. AR 865-67.

## III.  Administrative Proceedings

Hughes applied for disability insurance benefits and supplemental security income on September 10, 2014, just before her 30th birthday, alleging that she had been disabled since June 30, 2014 as a result of arthritis, fibromyalgia, depression, anxiety, obesity, degenerative bone disease, and knee problems.[2]  After her application was denied initially and on reconsideration, she requested a hearing before an administrative law judge ("ALJ").  A hearing was held on March 31, 2017, at which Hughes was represented by counsel and testified.  AR 36- 70.  The ALJ also heard testimony from Jacquelyn Winkman, a vocational expert.

Hughes testified that:

She lives with her father in a house, where she spends 80-85% of the day lying down or with her feet elevated because of pain.  Hughes's father does most of the cooking, although Hughes occasionally makes something easy like frozen pizza or something in the microwave.  She had vacuumed once in the past six months.  She does the dishes on occasion, sees friends every other week, grocery shops with a cart that she can hold on to, plays games on her phone and watches movies.  She has fairly severe anxiety and does not like to leave the house. She crochets, but can do so for about 10 minutes before needing a break.  She sits while showering because of pain or dizziness.  She sees her doctors every three to six months unless she has a flare-up, in which case she will call and schedule an appointment.  She said her pain had worsened in 2014, making it difficult to drive longer distances to find work.

---

[2] Hughes had previously applied for Disability Insurance Benefits in August 2010. That application was denied at the hearing level and affirmed by the Appeals Council on June 30, 2014.  AR 125.

Hughes can walk a couple blocks. She tries to get out and walk once or twice a week. Due to pain, she can stand for no more than 10 minutes, sit for no more than an hour, and lift less than a gallon of milk. The more she does, the more pain she has. Although her 2016 surgery helped her back pain, she still has pain going down into her legs.

After Hughes testified, the ALJ heard testimony from Winkman, the vocational expert. Winkman provided responses to a number of hypotheticals based on a person of Hughes's age, education and work experience with various limitations that were specified by the ALJ. Winkman also testified that, in general, an employer would tolerate an employee being off task no more than 15 percent of the time and would tolerate no more than 1-2 absences a month.

## IV. ALJ's Decision

The ALJ issued a written decision on June 23, 2017. Applying the agency's five-step sequential evaluation process for disability claims, *see* 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4), the ALJ found at Steps One through Three that: (1) Hughes had not engaged in substantial gainful activity after her alleged onset date; (2) she had the severe impairments of inflammatory arthritis, osteoarthritis of the knees, sacroiliitis/sclerosis of the sacroiliac joints, degenerative joint disease of the lumbar spine, myalgia, obesity, affective disorder and anxiety disorder; and (3) none of Hughes's impairments, singly or combined, met or medically equaled the severity of an impairment deemed by the Commissioner to be presumptively disabling.

The ALJ determined that in spite of her impairments, Hughes had the residual functional capacity ("RFC") to perform sedentary work with the following limitations:

- occasional operation of foot controls, bilaterally;

- frequent operation of hand controls, bilaterally;

- frequent handling, fingering and feeling, bilaterally;

- occasional ramps and stairs;

- no ladders, ropes or scaffolds;

- occasional balancing, stooping, kneeling, crouching, and crawling;

- no work at unprotected heights or near moving mechanical parts, no operation of a motor vehicle and no exposure to vibration;

- simple, routine tasks with simple work-related decisions;

- frequent interaction with supervisors and co-workers;

- occasional interactions with the public; and

- minimal work changes.

Relying on the vocational expert's response to a hypothetical that had included these limitations, the ALJ determined at Step Four that Hughes could not perform her past relevant work. At Step Five, the ALJ again relied on the vocational expert's testimony and found that, given her age, education, and the above limitations, Hughes was able to make a vocational adjustment to other, unskilled work existing in the national economy, examples of which were order clerk, document preparer, and video surveillance monitor.

In reaching her conclusions about Hughes's RFC, the ALJ found that Hughes's allegations about the persistence, intensity, and limiting effects of her pain and other symptoms were not fully consistent with the medical evidence and other evidence in the record. First, the ALJ found

that the objective medical evidence did not fully support the extreme limitations alleged by Hughes. In support of this finding, the ALJ cited to multiple medical examination findings in which Hughes was described has having no apparent distress or only moderate distress due to pain, had a normal gait, full strength, and no difficulty changing positions from sitting to standing or climbing onto or off the examining table. AR 22. The ALJ also noted that treatment notes in November 2014 indicated that Hughes's pain was generally well controlled.

As for mental limitations, the ALJ noted that Hughes's symptoms improved with medication, and that her mental status evaluations had been largely normal, with Hughes reporting that most of her symptoms were pain-related. AR 24. The ALJ gave little weight to Hughes's Global Assessment of Functioning scores that suggested "moderate to serious" psychological symptoms or difficulty in social, occupational, or school functioning. The ALJ stated that such scores provide at best a general insight into the claimant's mental state at a specific point in time, rather than over an extended period. Further, some of Hughes's scores were assessed prior to her onset date. AR 27.

Second, the ALJ found that Hughes had refused to pursue a number of recommended treatments, which "suggests that her pain levels were not as debilitating as alleged." *Id*. Specifically, the ALJ noted that Hughes had abandoned pain management after only one session "and never did undergo water therapy treatment, though it was repeatedly recommended by rheumatology and pain management." *Id*. In addition, Hughes had rejected the idea of a nerve block as a "bad idea" and did not follow through with a bariatric surgeon even though her obesity was noted to be an influential factor in her pain. Hughes's mental health treatment had been sporadic as well, with large gaps between therapy sessions and no evidence of psychiatric treatment during the six months preceding the hearing. AR 24.

Third, the ALJ found that the claimant's "activities of daily living are not limited to the extent one would expect given her allegations." *Id*. The ALJ observed that Hughes was able to: perform most self-care including showering, feeding herself and using the bathroom; she cared for her cat, including feeding her and cleaning her litter box; and she was able to walk around the grocery store with the assistance of a shopping cart. The ALJ also cited medical treatment notes reflecting that Hughes reported gardening, riding a stationary bike, taking care of her niece and nephew 4 of 7 days a week, crocheting and even tubing with friends a couple of times.

As for the opinion evidence concerning Hughes's mental limitations, the ALJ gave significant weight to the opinions of the psychological consultative examiners, Herz and Warrior, finding these opinions to be generally consistent with the overall evidence of record, including Hughes's reports that her symptoms were largely related to her pain, her failure to regularly attend treatment sessions, and treatment notes indicating improvement in psychiatric symptoms with medication. AR 25.

The ALJ gave "moderate weight" to the opinions of the state agency psychological consultants who found that Hughes was able to perform the mental demands of simple, routine, unskilled work, able to adapt to routine workplace changes, and able to relate adequately to supervisors, co-workers and the general public. The ALJ nonetheless found that evidence adduced at the hearing level, "including the claimant's reports of social anxiety," supported additional social limitations. *Id*.

Finally, the ALJ afforded "little weight" to Dr. Huang's restrictive opinion, finding it inconsistent with Hughes's intermittent visits to her mental health providers and inconsistent with the objective evidence that generally showed that Hughes's symptoms were controlled on medication. *Id*.

As for physical limitations, the ALJ gave little weight to Dr. Somers and Phillips-Riemer's restrictive opinions concerning Hughes's physical abilities, explaining that neither opinion was supported by the objective medical evidence. AR 26. The ALJ also noted that Phillips-Riemer, as a nurse practitioner, was not an "acceptable medical source," even though she was an "other source" whose opinion deserved consideration under 20 C.F.R. §§ 404.1527 and 416.927. *Id*. The ALJ deemed Dr. Somers's report inconsistent with Hughes's reported activities, such as caring for children and tubing with her friends. *Id*.

In assessing Hughes's physical RFC, the ALJ accorded "partial weight" to the state agency consultants' findings that Hughes could perform a modified range of light work, finding that "their overall conclusions that the claimant was able to perform work are generally consistent with the overall evidence of record, including treatment notes indicating that the claimant's pain was generally well controlled." AR 26. However, the ALJ noted that the state agency physicians "did not have the benefit of reviewing the full hearing level record," which included Hughes's 2016 back surgery. *Id*. Accounting for that later evidence, the ALJ found that Hughes could perform only sedentary work. *Id*.

Finally, the ALJ gave little weight to a form submitted by Hughes's mother, Susan Chapman, on which she indicated that Hughes could not lift more than a gallon of milk, could not squat or kneel, could stand only 10 minutes, and could walk 3-4 blocks. AR 365-72. The ALJ found that Chapman's statements lacked "medically acceptable standards," weren't specific enough, and were inconsistent with the objective medical evidence. AR 27.

OPINION

## I. Standard of Review

As the parties understand, Hughes is not entitled to *de novo* consideration by this court. On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must follow the Agency's own rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## II. Adequacy of the Hypothetical

Hughes argues that the ALJ's hypothetical question to the vocational expert was flawed because it did not account verbatim for the ALJ's finding, when evaluating the "Paragraph B criteria" of the listings for mental impairments, that Hughes would have "moderate" limitations in concentration, persistence and pace and in interacting with others. Hughes further contends that the ALJ's RFC was deficient because it did not expressly include a number of other "moderate" limitations endorsed by state agency consultants Lefevre and Jacobson on the "worksheet" portion of their mental RFC assessments.

As a general rule, the ALJ's hypothetical question to the VE "must include all limitations supported by medical evidence in the record." *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004). Specifically, with regard to limitations in the area of concentration, persistence and pace, in most instances "the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 620–21 (7th Cir. 2010) In *O'Connor–Spinner*, the court determined that it was unclear whether a hypothetical that limited the claimant to simple, repetitive tasks with simple instructions would have caused the VE to eliminate positions that would pose significant barriers to an applicant's depression-related problems with concentration, persistence and pace. *Id*. *See also Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004) ("simple, routine" tasks did not adequately account for "impairment in concentration"); *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008) ("simple, unskilled work" does not account for difficulty with memory, concentration, or mood swings).

However, "concentration, persistence, and pace" are not "magic words" that must be used in the ALJ's hypothetical. *O'Connor-Spinner*, 627 F.3d at 619. Moreover, when a medical source of record whose opinion the ALJ properly finds credible translates "moderate" findings of functional limitations into a particular residual functional capacity assessment, the ALJ may reasonably rely on that assessment to formulate the RFC finding and hypothetical question. *Johansen v. Barnhart*, 314 F.3d 283, 285-86 (7th Cir. 2002) (concluding that the ALJ could reasonably rely upon the opinion of "the only medical expert who made an RFC determination" that translated "findings into a specific RFC assessment"); *see also Milliken v. Astrue*, 397 Fed. App'x 218, 221-22 (7th Cir. 2010) (affirming ALJ's residual functional capacity finding limiting claimant to unskilled work because medical expert opined that the claimant retained ability to perform "unskilled work tasks" despite her limitations in concentration, persistence, or pace); *Calhoun v. Colvin*, No. 12-204, 2013 WL 3834750, at *10 (N.D. Ind. July 24, 2013) (affirming ALJ's residual functional capacity finding limiting claimant to "simple, repetitive tasks" because the ALJ relied "almost verbatim" on residual functional capacity translation of the state agency psychologist).

Measured against these guideposts, the ALJ's hypothetical adequately reflected Hughes's mental limitations. As the Commissioner points out, state agency consultant Lefevre ultimately opined in her narrative RFC assessment that, in spite of Hughes's slight or moderate limitations in some areas, she was able to "perform the mental demands of simple, routine unskilled work." Jacobson, the state agency consultant during reconsideration, found that Hughes did *not* have sustained concentration and persistence limitations, but had moderate limitations in her ability to interact socially and adapt. Jacobson nevertheless concluded that Hughes would be "able to

sustain at least basic demands associated with relating adequately with supervisors, co workers and general public," and was "able to adapt to routine workplace change, remain aware of environmental hazards, form basic plans/goals, travel independently." AR 167-68.

The ALJ addressed both of these opinions in her decision. She found that the consultants' conclusions that Hughes could perform the mental demands of simple, routine unskilled work and adapt to workplace changes were consistent with the overall evidence, including Hughes's self-reports of being able to care for her niece and nephew, along with the relatively normal findings of the psychological consultants during mental status examinations. The ALJ found, however, that the state agency consultants had not adequately accounted for Hughes's reports of social anxiety, which supported additional social limitations. AR 25.

Hughes does not challenge the ALJ's reasoning or argue that the state agency consultants' narrative RFC assessments failed to adequately capture the "moderate" limitations they endorsed on their worksheets. She simply argues that the ALJ erred *simpliciter* by not incorporating verbatim the agency consultants' worksheet observations. In light of the foregoing discussion, this argument is not persuasive. By relying on the state agency consultants' narrative RFC assessments in formulating her own RFC, the ALJ implicitly—and adequately—accounted for Hughes's moderate limitations in concentration, persistence and pace and in interacting with others.

Next, Hughes argues that the ALJ overlooked certain limitations found by Gordon Herz, Ph.D., one of the examining psychologists whose opinion the ALJ found was entitled to significant weight. Hughes notes that Herz found that Hughes would be "preoccupied at times" with her pain and personal issues, which could negatively impact her interactions with

supervisors and co-workers and her concentration, persistence, and pace. Hughes argues that the "ALJ failed to explain how an employee who is preoccupied with emotional and physical difficulties and is perceived as ineffective and neglectful of work expectations would be able to maintain employment." Br. In Supp., dkt. 9, at 11. What Herz said was that Hughes would be preoccupied *at times*; this can be considered in conjunction with the VE's testimony that an employer would tolerate an employee being off task up to 15% of the time. Moreover, the ALJ specifically stated that she had limited Hughes to performing simple, routine tasks in a job with minimal changes and requiring only simple judgment in order to account for Hughes's moderate difficulties in concentrating, persisting, and maintaining pace, and that she had accounted for Hughes's difficulties in interacting with others by limiting her to responding frequently to supervisors and co-workers and occasionally to the public. This qualifies as an adequate and logical bridge between Herz's conclusions and the ALJ's ultimate RFC assessment.

Finally, Hughes argues that the ALJ did not fairly summarize Dr. Warrior's opinion when she wrote that Warrior had opined "that the claimant presented as a bright, able young woman who would be cognitively capable of work and her anxiety apparently had not been sufficiently impairing to really affect the work." AR 25. Hughes argues that this summation unfairly overlooks the fact that Dr. Warrior also said that Hughes's concentration, attention and work pace would be moderately reduced because of pain and occasional anxiety, that she had a Global Assessment of Functioning Score of 45 (indicating serious symptoms), and that Hughes's "primary issue has been with attending regularly and persisting through a full work week due to her pain issues." AR 535. As noted above, however, the ALJ adequately accounted for Hughes's difficulties with concentration, attention and work pace by reducing her to simple, routine unskilled jobs. The ALJ explained that she was giving little weight to the GAF scores in the

record, properly finding them to be of limited usefulness in assessing Hughes's actual functioning. *Accord Green v. Saul*, No. 19-1192, 2019 WL 3297472, at *1 (7th Cir. July 23, 2019) (noting that GAF "is no longer widely used by psychiatrists and psychologists."). Finally, the ALJ accommodated Hughes's pain complaints by limiting her to sedentary work with various postural restrictions. For all these reasons, the ALJ did not err in her assessment of Dr. Warrior's opinion.

### III. Credibility Assessment

In evaluating the credibility of a claimant's statements regarding her symptoms, the ALJ must first determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 WL 1119029, *3. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. *Id.*, 2016 WL 1119029, *4. If the statements are not substantiated by objective medical evidence, then the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record while considering a variety of factors, including the claimant's daily activities, factors that precipitate and aggravate the symptoms, and the treatment the claimant has received for relief of the pain or other symptoms. *Id.*, 2016 WL 1119029, *7. The court reviews an ALJ's credibility finding deferentially, reversing only if it is "patently wrong." *Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018); *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017).

In this case, the ALJ concluded that while Hughes's impairments could reasonably be expected to cause the symptoms Hughes reported, her statements about the intensity,

persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. AR 21. In support of this finding, the ALJ noted that the objective medical evidence failed to substantiate the severity of the alleged limitations: Hughes was noted during office visits to be in no acute distress, she had no difficulty arising from a seated to a standing position or climbing on and off the examining table, she had normal strength, a steady gate, full and symmetrical reflexes, and normal range of motion; further, treatment notes indicated that Hughes's symptoms were "well controlled"on pain medication. *Id*.

Second, the ALJ noted instances where Hughes failed to pursue recommended treatment, particularly water therapy treatment, a nerve block, and bariatric surgery, all of which were recommended for pain relief. AR 22.

Third, the ALJ noted that Hughes's daily activities, including managing her personal needs, performing some household chores, shopping, gardening, taking care of her niece and nephew and tubing with friends a couple of times, "diminish the persuasiveness of the claimant's allegations regarding the severity of her symptoms and limitations." *Id*.

Hughes challenges each of these findings. First, she argues that the ALJ "played doctor" when she found that the objective evidence did not support the extreme limitations alleged by Hughes. Although an ALJ may not discredit a claimant's testimony solely because of a lack of objective medical support, *Villano*, 556 F.3d at 563, the ALJ is allowed to consider the objective medical evidence as part of her analysis. *See, e.g., Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) ("[T]he lack of objective support from physical examinations and test results is still relevant even if an ALJ may not base a decision solely on the lack of objective corroboration of

complaints of pain"); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (noting that "discrepancies between objective evidence and self-reports may suggest symptom exaggeration"). Indeed, the commissioner's regulation concerning subjective complaints expressly directs ALJs to look to the objective medical evidence for corroboration, explaining that "[e]xamples such as reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, the symptom of pain." SSR 16-3p. The ALJ did not err by noting the absence of such findings–along with notes reporting pain control with medication– as indicators that Hughes's pain was not as limiting as she alleged.[3]

Next, Hughes argues that the ALJ erred by drawing adverse conclusions from her failure to follow recommended treatment without exploring the reasons for that lack of treatment.[4] SSR 16-3p authorizes an ALJ to consider the claimant's failure to follow prescribed treatment when evaluating the credibility of the claimant's subjective complaints. Before drawing an adverse inference from lack of compliance with treatment recommendations, the ALJ must consider possible reasons for the lack of treatment. *Id.*; *see also Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the failure to follow a treatment plan

---

[3] For this same reason, the ALJ properly rejected the third-party function report from Sue Chapman, Hughes's mother, which largely mirrored Hughes's report of her daily activities and abilities.

[4] Hughes also faults the ALJ for failing to make a finding that the treatment would have restored work capacity. Br. in Supp., dkt. 9, at 17, citing SSR 82-59, 1982 WL 31384, *1 (1982) ("An individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the [Social Security Administration] determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability."). Hughes's argument is misplaced: the ALJ did not deny benefits under the non-compliance regulation. Rather, she cited non-compliance as part of her credibility analysis, which she is allowed to do. *See Thao v. Astrue*, No. 08-C-0033, 2008 WL 2937425, at *7 (E.D. Wis. July 23, 2008) (distinguishing violation of the non-compliance regulation from consideration of medical evidence in evaluating credibility).

can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for lack of medical care before drawing a negative inference").

The ALJ did that in this case. Specifically, she noted that Hughes's failure to pursue treatment could not be blamed on a lack of health insurance, insofar as Hughes reported in April 2014 that she had health insurance coverage. AR 22. Even so, argues Hughes, the ALJ did not consider *other* reasons for Hughes's lack of treatment. Specifically, Hughes notes that the ALJ found elsewhere in her decision that Hughes told Dr. Somers in March 2015 that she had not seen her mental health counselor in a while because she got too anxious. AR 24. Hughes argues that the ALJ should have found from this note that Hughes's anxiety was the reason for her failure to pursue all the other recommended treatment. I disagree. Hughes does not argue or cite to any evidence suggesting that her anxiety actually prevented her from attending water therapy, consulting with a bariatric surgeon or considering a nerve block. Indeed, the record indicates that Hughes consulted with other specialists, including an orthopedic surgeon, which suggests that her anxiety was not as limiting as Hughes now suggests. Moreover, Hughes does not challenge the ALJ's finding that Hughes stopped taking her anxiety medication at one point. Overall, the record adequately supports the ALJ's conclusion that Hughes's failure to pursue certain treatment options suggested that her pain was not as debilitating as she alleged.

Next, Hughes criticizes the ALJ's analysis of her daily activities. Hughes points out that the Seventh Circuit has criticized ALJs for equating activities of daily living with an ability to work. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010). But the ALJ did not do this here. Rather, the ALJ considered Hughes's description of her daily activities in assessing whether Hughes's testimony about the effects of

her impairments was credible or exaggerated. See 20 C.F.R. § 404.1529(c)(3)(i) (explaining that agency will consider daily activities in evaluating severity of claimant's symptoms). As the ALJ noted, Hughes testified that her symptoms were so severe that they prevented her from doing much other than lie down with her feet elevated for most of the day. Yet, Hughes was able to perform light household activities, self-care, drive, shop for groceries and care for a cat. Medical treatment notes indicated that Hughes had been able to garden, ride a stationary bike, take care of her niece and nephew four days a week, and even go tubing with friends a couple of times. While these activities are not necessarily compatible with full time work, the ALJ reasonably concluded that such activities tended to diminish the credibility of Hughes's reports of all-encompassing, disabling pain and anxiety. *Accord Loveless v. Colvin*, 810 F.3d 502, 508 (7ᵗʰ Cir. 2016) (ALJ considered Loveless's ability to perform light household chores, drive a car, and shop for groceries as one factor that weighed against his account of disabling limitations).

Finally, Hughes criticizes the ALJ for failing to consider her medications and treatment history, which Hughes argues are consistent with her subjective allegations. However, the ALJ explicitly discussed Hughes's medical history, including the medications and injections she had received and other treatments that had been recommended. AR 22. Hughes faults the ALJ for not mentioning that Hughes used a TENS unit once a week, sometimes wore wrist braces at night, and had a knee brace that she did not wear often because it hurt. AR 324. It is well-settled, however, than an ALJ need not discuss every piece of evidence in the record, *see, e.g., Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Here, Hughes's occasional use of braces and a TENS unit do not compel a finding of disability and do not undermine the ALJ's conclusion that Hughes is capable of a limited range of sedentary work.

Taken as a whole, the ALJ's decision is thorough and well-articulated. It shows that the ALJ considered all of the evidence in the record. Hughes's argument boils down to a request that this court re-weigh the evidence, which it cannot do. Judicial review of DIB denials frequently involves challenges to the ALJ's reasons for discounting the claimant's subjective complaints, and the court is obliged to carefully consider these challenges without improperly second-guessing the ALJ's conclusion. In this case, the ALJ's credibility determination was tied to evidence in the record and it is not patently wrong. As a result, this court may not disturb this finding. *Alvarado v. Colvin*, 836 F.3d 744, 749 (7th Cir. 2016).

## IV. Opinion Evidence

### A. The ALJ Did Not "Play Doctor"

As summarized above, the record contained opinions from three of Hughes's treating medical providers, Dr. Somers, Dr. Huang and nurse practioner Phillips-Riemer, all of whom endorsed limitations that would preclude Hughes from performing even unskilled sedentary work on a consistent and regular basis. Normally, "[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v. Barnhart*,

390 F.3d 500, 503 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)).[5]  The Seventh Circuit nevertheless acknowledges that, while a treating physician's opinion is important, it is not the final word on a claimant's disability.  *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).  "The treating physician's opinion is important because that doctor has been able to observe the claimant over an extended period of time, but it may also be unreliable if the doctor is sympathetic with the patient and thus 'too quickly find[s] disability.'"  *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (quoting *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)).

Accordingly, the ALJ may discount a treating physician's medical opinion if it is internally inconsistent, conflicts with the provider's own treatment notes, is based solely on the patient's subjective complaints, or is inconsistent with the opinion of a consulting physician.  *Id*.  *See also, Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016); *Henke v. Astrue*, 498 Fed. Appx. 636, 640 (7th Cir. 2012).  The ALJ must minimally articulate her rationale, *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008), and the court will uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (internal quote marks omitted).

In this case, the ALJ rejected the restrictive opinions from Hughes's treating medical sources for largely the same reasons she declined to fully credit Hughes's subjective complaints:

---

[5]  The Social Security Administration recently modified the treating-physician rule to eliminate the "controlling weight" instruction. *See* 20 C.F.R. § 404.1520c ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources."). However, the new regulations apply only to disability applications filed on or after March 27, 2017. *Compare* 20 C.F.R. § 404.1527 ("For claims filed (see § 404.614) before March 27, 2017, the rules in this section apply.") (emphasis added), *with* 20 C.F.R. § 404.1520c ("For claims filed (see § 404.614) on or after March 27, 2017, the rules in this section apply."). Hughes filed her application in this case in 2014. Accordingly, the ALJ was required to apply the treating physician rule when deciding Hughes's application.

they were not adequately supported by the objective medical evidence, Hughes's treatment history, and her daily activities. As noted previously, with respect to the objective evidence, the ALJ reviewed notes from medical examinations and determined that, in general, they showed that Hughes's pain and anxiety were well-controlled on medication; Hughes was most often observed to have normal strength, no obvious pain behaviors, normal range of motion, and normal gait; mental status evaluations and Hughes's activities revealed no more than moderate mental limitations; and her visits to her psychiatrist and therapist were intermittent.

Hughes does not challenge the accuracy of these findings or the conclusions the ALJ drew from them.[6] Instead, she argues that the ALJ improperly "played doctor" by interpreting examination records. I disagree. Although Hughes is correct that an ALJ may not substitute her opinion for that of a physician, *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003), it is also true that an ALJ is not only allowed to weigh, but must weigh the evidence and draw appropriate inferences from the record, including the objective medical evidence. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). In fact, the degree to which a treating source opinion about the severity of a claimant's impairment is supported by the objective medical evidence is one of the primary factors the ALJ must consider in determining the weight to give the opinion. 20 C.F.R. § 404.1527(c)(2). Thus, the ALJ committed no error in looking to see whether the opinions by Hughes's treating physicians were supported by the objective evidence. What is more, the ALJ's conclusion that Hughes's treating providers were overstating Hughes's

---

[6] Although the ALJ did not recite at length the contradictory medical evidence during her discussion of the treating source opinions, it is reasonable to presume that she was relying on the same evidence and rationale she provided when evaluating Hughes's subjective complaints earlier in her decision,. *See Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015) (noting that the court reads the ALJ's decision as a whole, and it would be a needless formality to require repetition of substantially similar factual analyses).

limitations was backed up by the state agency doctors, who concluded that Hughes was capable of full time unskilled work at the light exertional level.

As the ALJ recognized in her decision, the state agency physicians who evaluated Hughes's physical impairments "did not have the benefit of reviewing the full hearing level record, including the claimant's back surgery in October 2016." AR 26. The ALJ determined that this additional evidence warranted a further reduction in Hughes's residual functional capacity, from light to sedentary work. *Id*. In another take on her "playing doctor" argument, Hughes argues that the ALJ lacked the medical expertise to draw this conclusion. In support, Hughes cites *Akin v. Berryhill*, 887 F.3d 314, 317 (7th Cir. 2018), in which the Seventh Circuit concluded the ALJ impermissibly "played doctor" by evaluating MRI results that had not been interpreted by a state agency physician. The court reasoned that, "without an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment." *Id*. A number of other Seventh Circuit cases have been to the same effect. *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (ALJ erred in interpreting MRI results without medical input); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (ALJ erred in failing to submit claimant's first MRI in 11 years to medical scrutiny and in interpreting results herself); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (ALJ erred in accepting a state agency physician's opinion where physician did not have access to later medical evidence containing "significant, new, and potentially decisive findings," including new MRI report, that could "reasonably change the reviewing physician's opinion"); *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018) (ALJ who denied plaintiff's application in 2014 erred in relying on 2007 mental RFC assessment by state agency psychologist where record contained newer treatment notes from

plaintiff's treating psychologist that reasonably could have changed consulting psychologist's opinion).

These cases are not controlling here because the ALJ did not attempt to interpret raw images or test data on her own. *Accord Schuelke v. Saul*, No. 18-CV-833-JDP, 2019 WL 2514825, at *2 (W.D. Wis. June 18, 2019) (declining to remand for expert consideration of EMG and MRI evidence where "the ALJ's record citations show that he was relying on opinions from Schuelke's treating physicians, who analyzed these scans and test results. He was not looking at the raw images and test results and analyzing them himself"). To the contrary, the ALJ relied on treatment notes post-dating Hughes's lumbar surgery and Hughes's own testimony to conclude that the surgery had largely resolved Hughes's severe back pain. AR 23. Nevertheless, in light of Hughes's reports of recurrent pain in the left leg and her observable left foot drop, the ALJ reasonably determined that a restriction to sedentary work was appropriate. This is not a situation in which the ALJ acted as her own medical expert; rather, it was the ALJ's appropriate exercise of her duty to determine Hughes's RFC based on all the evidence in the record. *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's RFC is a matter for the ALJ alone – not a treating or examining doctor – to decide.").

## B. Substantial Evidence Supports the ALJ's Weighing of the Opinions

In addition to her global objections, Hughes raises specific objections to the ALJ's weighing of the opinions from Hughes's treating sources. First, she argues that the ALJ committed legal error when she determined that Phillips-Reimer, the nurse practitioner, was an "other source" rather than a "medical source who is not an acceptable medical source." *See* 20

C.F.R. § 404.1527(f)(1)(addressing how ALJ weighs opinions from "medical sources who are not acceptable medical sources and from nonmedical sources").  Even if the ALJ failed to use the proper terminology, any error was harmless.  The ALJ properly acknowledged that, as a nurse practitioner, Phillips-Reimer could provide special knowledge or insight into the severity of Hughes's impairment and her level of functioning.  AR 26 (citing 20 C.F.R. § 404.1527).  Nevertheless, she rejected Phillips-Reimer's opinion on the ground that it was not supported by the objective medical evidence.  As an example, the ALJ noted that "treatment notes following the claimant's thoracic surgery indicated that the claimant was definitely doing better and her gait had returned to normal."  AR 26.

Hughes attacks this finding on the ground that Hughes had lumbar, not thoracic, surgery.  However, it is fair to presume that this was an unintentional error, insofar as the ALJ had previously correctly noted that Hughes had surgery at her L4-L5 joint.  AR 23.  Regardless, the salient point was that Hughes's back pain improved after her surgery, which Hughes herself acknowledged at the hearing.  Moreover, the ALJ cited Hughes's improvement after surgery as just one example of how the objective evidence did not support Phillips-Riemer's conclusion that Hughes could not perform even sedentary work.  Other examples, discussed previously in this opinion, provide substantial support for the ALJ's determination to give little weight to Phillips-Riemer's opinion.

With respect to Dr. Huang, Hughes argues that the ALJ "cherry-picked" the record when she noted that at a visit with Hughes in January 2017, Huang noted that Hughes's anxiety was controlled and that her last visit had been in July 2016.  Hughes notes that Huang's examination notes also reveal that Hughes had chronic daily pain, was unable to stand or walk for a long time,

and continued to have intermittent symptoms of depression and daily anxiety. Again, however, an ALJ need not discuss every piece of evidence in the record. Moreover, the ALJ accepted that Hughes was limited in her ability to stand and walk (thus limiting her to sedentary work) and that she had mental limitations that affected the types of work she could do. Finally, the ALJ cited Huang's January 2017 office note as just one example of the disconnect between the evidence and Huang's opinion. She also noted the relatively normal mental status evaluations by the consultative psychological examiners, their conclusions that Hughes's limitations were mostly pain-related, and their determination that Hughes had at most slight-to-moderate mental limitations. All of this evidence supports the ALJ's decision to give little weight to Dr. Huang's opinion.

Finally, Hughes challenges the ALJ's decision to give little weight to opinions from Dr. Somers, Phillips-Riemer and a psychological consultative examiner that pre-dated Hughes's alleged onset date and which supported a finding of disability. However, Hughes does not explain why the ALJ should have found these opinions credible when Hughes herself is not contending that she was disabled at the time these medical sources formed their opinions. Moreover, the earlier opinions from Somers and Phillips-Riemer were largely duplicative of their January 2017 opinions. Therefore, the ALJ properly rejected them for the same reasons she rejected the post-onset opinions.

## V. Vocational Expert Testimony

Finally, I am unpersuaded by Hughes's claim that the Commissioner did not properly show that there were a significant number of jobs that she was capable of performing. An

individual is disabled only if he or she "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). The Commissioner bears the burden of showing that there are a significant number of jobs that the claimant is capable of performing. *See* 20 C.F.R. § 404.1560(c)(2); *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008) (per curiam). The Commissioner typically uses a vocational expert ("VE") to assess whether there are a significant number of jobs in the national economy that the claimant can do. *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993).

Here, the VE testified that a person with Hughes's limitations could perform approximately 89,000 order clerk jobs, 99,000 office worker jobs, and 101,000 video surveillance monitor jobs that existed in the national economy, citing representative examples from the *Dictionary of Occupational Titles* of each kind of job. AR 61-62. Although Hughes did not question the VE's jobs or job numbers at the hearing, she now argues that the office worker and video surveillance jobs identified by the VE are obsolete, and therefore the VE's testimony was not reliable. And because the VE's testimony about the officer worker and video surveillance jobs was unreliable, argues Hughes, the court should find her testimony about the order clerk jobs unreliable as well.

Hughes arguably waived her right to attack the VE's testimony on these grounds by failing to raise these objections at the hearing. Regardless, her arguments are without merit. With respect to the office worker job, the VE testified that the DOT number she identified, 249.587-018 (document preparer), was just one of about 25 different kinds of office worker jobs

of the 99,000 available nationally that were consistent with the ALJ's hypothetical. AR 62. Hughes did not ask the VE to provide more examples of office worker jobs from the DOT, and she makes no attempt to argue that there is not a single office worker job she can perform with her limitations. Given that as few as 174 jobs has been deemed a significant number, *see Allen v. Blowen*, 816 F.2d 600, 602 (11th Cir. 1987), the fact that one representative office worker job of 25 may be obsolete is not enough to eliminate more than a small fraction of the VE's job numbers.

The same goes for the video surveillance monitor job. The VE acknowledged that the job identified in the DOT described a video surveillance monitor in the government setting, but she explained that "now in this economy there are many, many environments in which individuals perform that job . . . the DOT doesn't have the new ones in it." AR 67. Thus, even if Hughes is correct that the video surveillance monitor job listed in the DOT as number 379.367-101 no longer exists, it is plain from the VE's testimony that her numbers estimates included jobs outside the government setting. Again, Hughes makes no showing that she would not be able to perform these other, non-government video surveillance jobs.

Finally, Hughes raises *no* challenge to the VE's testimony that there are 89,000 order clerk jobs in the nation that a person with her limitations can perform. She merely argues that because the rest of the VE's testimony was "fatally flawed," the ALJ had no basis for presuming that the VE's testimony about the order clerk jobs was reliable. As just discussed, however, Hughes has failed to show that the VE's testimony about the other jobs was fatally flawed. Thus, even if I were to credit her argument that the reliability of the VE's testimony must be established *in toto* rather than piecemeal, it fails on its premise.

In sum, the ALJ did not err in relying on the VE's uncontradicted testimony about the types and numbers of jobs that a person with Hughes's limitations could perform.

## VI. Conclusion

The administrative record in Hughes's case is over 1000 pages long, including the ALJ's 17-page single-spaced Decision, amplified in this court by over 70 pages of briefing from the parties. Hughes has challenged virtually every aspect of the ALJ's decision, and as noted at the outset, the evidence in the record probably could have supported a decision by the ALJ in Hughes's favor. But the ALJ, who had the opportunity to see Hughes testify in person, decided against awarding benefits to Hughes. Having considered the ALJ's decision and Hughes's challenges to it in light of the evidence in the record, the applicable regulations and the law of this circuit, I conclude that the ALJ applied the correct legal standards and supported her decision with substantial evidence.

## ORDER

IT IS ORDERED that the decision of the Commissioner of Social Security denying plaintiff Amanda Hughes's applications for Supplemental Security Income and Disability Insurance Benefits under the Social Security Act, is AFFIRMED.

Entered this 27th day of September, 2019.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge